# GEORGE SMITH and JAMES CARTER vs. JOSEPH P. WHIT-MAN, use of JOHN MAGUIRE.

1. In an action against a common carrier for a loss on freight occasioned by unnecessary delay and the unseaworthiness of the vessel; upon proof of such delay or unseaworthiness and a loss, the carrier can exempt himself from liability therefor, only by showing that such loss would and must have happened in the absence of such delay and unseaworthiness.
2. In an action against a common carrier for a loss on freight occasioned by delay of the vessel, if it be proved that the article freighted bore the same price, at the place of delivery, at the time it was delivered that it did at the time it ought to have been delivered: yet the owner of the article freighted is entitled as damage, to legal interest on the amount of money which would have arisen from the sale of the article at the time it should have been delivered to the time it was actually delivered.

GEORGE SMITH & JAMES CARTER vs. JOSEPH P. WHITMAN use of JOHN MAGUIRE.

## APPEAL FROM ST. LOUIS COURT OF COMMON PLEAS.

### STATEMENT OF THE CASE.

This was an action of assumpsit, brought for the recovery of freight money.

At the trial below, the plaintiff showed that in November 1845, the appellant, Smith and Carter, shipped on the steamboat Réveille, of which plaintiff was the master, at the port of Galena, 2003 pigs of lead, weighing 138 343 pounds. The lead was consigned to Webster & Co. of St. Louis, to be delivered to them "unavoidable dangers of the river and fire only excepted"—at St. Louis, upon the payment of freight at the rate of seventy-five cents per 100 lbs. The bill of lading was in the usual form and bore date Nov. 15th, 1845. The plaintiff further proved that Webster & Co. received the lead early in February, 1846, from the steamboat Fortune ; to which boat it had been re-shipped, in consequence of the grounding and loss of the Reveille. The partnership of Smith and Carter, and the fact that plaintiff was master of the Reveille, at the time of the shipment, were admitted.

Here the plaintiff rested.

The defendants then introduced evidence tending to show that the Reveille had no fit pilot for the trip and that after she was loaded, she waited a day or two at Galena for a pilot ; that at that season such a delay might diminish her chance of arriving at St. Louis, before the close of navigation ; that an extraordinarily high rate of freight was agreed upon, such as would not have been paid, unless the shipper expected that his lead would reach St. Louis before the close of navigation ; that the Reveille finally started insufficiently officered and equipped, in that she had only one pilot, while running in a trade in which two are necessary, and this one not used to this navigation, and was not provided with good and sufficient anchors, spars, tackles and rigging ; that the Reveille grounded on the lower rapids of the Mississippi river, where such anchors, spars and rigging are absolutely necessary ; and that she might have got off if she had been so provided and perhaps prevented from grounding ; that lead shipped by the steamboat St. Croix, which left Galena after the departure of the Reveille, arrived within thirty miles of St. Louis that fall, before the river closed ; that had the lead arrived before the close of navigation, it could have been sold for from $3,80 a $4,00 ; that when it did arrive it was worth only $2,50. In rebuttal, plaintiff gave evidence tending to show that the Reveille did not necessarily or improperly delay starting from Galena ; that she was sufficiently provided with pilots and crew and sufficiently officered, and equipped and provided with all necessary anchors, spars, tackles and rigging, and that it was not from the want of any of these things or from carelessness or negligence or incompetency on the part of those conducting her, that she got aground, or that the delivery of the lead in St. Louis was delayed. that there was no unnecessary or avoidable delay on the voyage, or in the delivery of the lead.—The plaintiff proved that the river closed that fall very suddenly, by freezing, about the 20th of November, when this lead was at or near the foot of the lower rapids, that the lead was finally delivered to the consignees among the first lots that were delivered in St. Louis, after the re-opening of navigation between the lower rapids and St. Louis and long before the re-opening of navigation to Galena that season, the plaintiff also proved that the price of lead is higher in St Louis in winter and spring, before the opening of navigation to Galena, than after, The plaintiff also introduced evidence tending to show that the price of lead in St. Louis in the month of February, 1846, after the lead in question arrived there, was as high or higher than it had been in the last half of the previous November, when the lead would have arrived had there been no extraordinary detention Among the actual sales it was proven that one was made in February, 1846, at $4,12½ of a lot of lead that had been stopped at the foot of the lower rapids by the closing of the river in the fall. The sale was made before the lead actually arrived but in anticipation of its arrival before the opening of navigation to Galena, which it did and among the first lots. Quite a number of actual sales were shown, and but one offer.

45

GEORGE SMITH & JAMES CARTER vs. JOSEPH P. WHITMAN use of JOHN MAGUIRE.

This was all the evidence.

At the request of the plaintiff, the court gave the following instructions to wit:

2nd. "If the jury find from the evidence, that the price of lead in St. Louis, in the month of February, 1846, after the lead in question arrived here, was as high as it had been in the last half of the November previous. the defendants will not be entitled to have any thing allowed them in this case, as damages for not delivering said lead in November."

3rd. "The best evidence of the price is actual sales and therefore in arriving at the price, the jury will be governed by actual sales, and not by mere offers made by one person to another."

Also on its own motion, the court gave the following instructions, to-wit:

4th. "If the jury should believe, from the evidence, that the delay in delivering the freight was occasioned by the negligence of the plaintiff, and that thereby the defendant was damaged, the jury will deduct the amount of such damages from the plaintiff's bill."

5th. "The measure of such damage, in case the jury shall find that the plaintiff is chargable with it, will be the difference in the value of the lead at the time it would probably have come to hand by careful and skilful management, and the value of it, when it actually reached St. Louis"

6th. "Whether the plaintiff was guilty of such negligence as to charge him with those damages, is for the jury to determine, by considering the manner in which the vessel was managed, after the freight was put on board. If the vessel was run aground in consequence of the incompetency of the pilot employed; or if it was not got off because it was not suitably equipped, he is liable for the damages thereby occasioned to the defendant. But if the vessel got on the rocks, whilst having a skillful pilot, and could not be got off after suitable appliances and efforts were used, the plaintiff is not chargeable, although the jury shall find that the vessel was not provided at other times with competent pilots, or sufficient equipments."

1. If the jury shall find, from the evidence, that the material delay was caused by the fact, that the boat got aground at the rapids, it is unimportant whether there was unnecessary delay in starting from Galena, or in reaching the rapids, unless they shall believe from the evidence, that these previous delays contributed to produce that which happened at the rapids."

To the instructions marked "2, 3, 6 and 1," the defendants duly excepted.

At the instance of the defendants, the court gave the following instructions, to-wit:

7th. "If they believe from the evidence, that the boat, after she was loaded, was delayed at Galena for a pilot, or that she started down without enough or proper pilots, or that she was materially deficient in the usual and needful equipments of boats in that trade, for getting through the difficulties of that navigation, and that these, or any of these things contributed towards preventing the delivery of the lead that fall, they should allow the defendants such damages as, from the evidence, they believe the defendants to have suffered by reason thereof."

But the court refused to give the following, to wit:

8th. "A sale of lead to arrive does not give the market price at the time of sale."

To which decision the defendants duly excepted

The verdict was for the plaintiff.

The defendants filed a motion for a new trial for these reasons, to wit : 1st. Because the court gave the jury erroneous instructions. 2nd. Because the court refused to give the instructions asked. 3d. Because the verdict is against law, under the evidence.

The court refused said motion, to which decision the defendants duly excepted and appealed from trial and judgment of said court, to this court.

TODD & KRUM for appellants.

1st. The court below erred in giving the instructions marked six & one, because they assume that an unnecessary or negligent delay or the unseaworthiness of the vessel will not make the

carrier liable for a loss, unless the loser prove, that such loss was caused by such delay or unseaworthyness ; whereas the appellants insist the law under the most favorable view for the carriers, to be, that upon showing such delay or unseaworthyness and a loss, the carrier can exempt himself from liability therefor only by showing that such loss *would* and *must* have happened in the absence of such delay and unseaworthyness. Even this defence is a relaxa-ation of the law, and not yet universally allowed. 11 Mo. Rep. 299; 6 Bingham 716,12 Mo. Rep. 272 10 Mo. Rep 6 ; 4 Binney 127; Story on Bailments 413 d.

The loss or injury is sufficient proof of negligence or misconduct or of the intervention of human agency, and that (the loss or injury) proved the "*onus probandi,*" is at once upon the carrier to exempt himself from liability by showing not only that it was produced by a cause which either under the general law or his special contract with the loser, would *per se* exempt him, but also that it must and would have happened in any and all events.

See authorities above cited; also Story on Bail. sec. 523, 529, 574; Angell's law of Carriers sec. 472, 202 ; 7 Yerg 340, 3 Story C. C. Rep. p. 349.

2nd. The court erred in giving instructions marked 2, for if the supposition of the instruc-tions were true, still the appellants would be damnified by losing the use of their money from November to February. In this case quite a large sum. 8 J. R. 213 decides that this dam-age is proper to allow in case the loser makes out a case for damages or indemnity. By this instruction the court assumes as true a matter for the province of a jury solely, to wit: wheth-er appellants suffered, although prices were equal in November and February, as they must have done, as shown above. So that by reason of this instruction, and the giving of the one marked 3 and the refusing to give the one marked 8, the jury might have found the appellee guilty, and yet allow him no damages, by also finding that the price in February, was as good as in November.

3rd. By giving the instruction marked 3, and refusing to give that marked 8, the court obliged the jury to adopt an erroneous rule for ascertaining price or market value.

In a sale of lead to arrive the price agreed upon is necessarily founded upon a speculative judgment of what lead may be worth at the time of its arrival ; in some cases it would be larger, in others smaller than the present price. From its nature, such sales are no evidence of the present price, and for this reason also, the court erred in giving instruction marked 3, because there was no evidence of an actual sale of *present* lead in February. When the lead did ar-rive, but only of one sale to arrive given on the part of the appelleee, and of offers to sell giv-en on part of appellants.

GEYER & DAYTON for appellee.

1st. The facts, as alleged by the appellants, and to which only the instructions refer, con-stitute if true, no defence to the claim for freight. The appellees right to freight was fixed by the delivery and acceptance of the lead ; and the appellants were not entitled to set off, against it ; damages, if they had sustained any, by reason of the lead not having been delivered as early as it should have been under the contract ; such damages could only be recovered in a separate action. 1 Eng. Com. law Rep. 308; 4 Campbell Rep. 119; 5 Bosanquet & Pul-len 135.

We are not aware of any cases in which such defence was allowed, except those found in the Pennsylvania Reports, and based expressly upon the peculiar statute of that State.

If the above proposition be correct, the judgment was of course for the right party, and for that reason ought to be sustained. Maston vs. Fanning, 9 Mo. Rep. 305 ; In matter of Pratte & Cabanne 12 Mo. 194.

If instruction No. 1, standing alone would be obnoxious to objections (which we utterly deny) it is unexceptionable when taken in connection with the others. Hart vs. Allen, 2nd Watts Rep. 114.

Instruction No. 6, relates to the competency of the pilots, and the suitableness and sufficiency of the equipments of the boat.

The appellants contended that the pilots were incompetent, by reason whereof the boat was run aground, and that for want of suitable equipments, she was not and could not be got off. This instruction tells the jury, that if they so find, the appellee is liable for any consequent damages, but if the boat got on the rocks, whilst having a skilful pilot, and could not be got off, although suitable appliances and efforts were used, the appellee is not chargeable, although the jury should find that the boat was not provided at other times with competent pilots and sufficient equipments.

The instruction should be carefully considered with reference to the facts of the case, the boat got aground only at the lower rapids, and there unavailing efforts were made to get her off. If the incompetency of the pilots occasion the former result, or the want of equipments the latter, the instruction declares the appellee responsible for the consequences. Thus, far there seems to be no exception to the instruction, but it goes on to declare, that if the boat grounded, while having a skilful pilot, and could not be got off with suitable appliances and efforts, the appellee is not responsible, although the boat at other times was not provided with competent pilots or sufficient equipments. It is the latter part of the instruction, which is excepted to.

There was not a particle of evidence showing or even tending to show, that the grounding at the rapids, or the failure to get off, was or could have been occasioned, or in the remotest degree effected, by any incompetency of the pilot, or insufficiency of the equipments up to the time of the arrival at the rapids, but the contrary was clearly shown. The pilot and equipments up to said arrival were sufficient for the navigation to the rapids. No accident happened up to that point, and no occasion occurred for any equipments not on hand. The real controversy was as to the sufficiency of pilots and equipments at the rapids. Some equipments necessary in passing through the rapids, were not essential in any other part of the navigation. (Davidson's testimony, see page 29 to 32 of record,) shows also, that it was customary to have, in passing the rapids, other pilots, than those who managed the boat in other places, and who could manage it perfectly well in other places. Persons resided at the rapids, and made it their business to pilot boats through them.

It is by no means clear, that the instruction was intended or understood at the trial to assert any thing stronger on this point, than that though the pilot in charge till the arrival at the rapids was not competent, or the equipments on board up to that time were not sufficient *for the navigation of the rapids*, still that mattered not if the deficiencies were supplied at the time of the accident.

The effect of any delay in getting to the rapids, consequent upon waiting at Galena for a pilot, and of the incompetency of the acting pilot, and of every other alleged fault of the appellee is declared and explained by the other instructions, Nos. 1, 4, 7. Every thing, which it can be pretended, that any or all of these things, if they existed, effected up to the arrival at the rapids, was delay in getting there, and the other instructions say, that if such delay or other faults, contributed to prevent the delivery of the lead, the appellee was responsible for the consequences. Instruction No. 6, was not designed to affect the question of delay ; but to relate to other matters. It at most, only says that incompetency of pilots and insufficiency of equipments at other places, ought not to be regarded as getting or keeping the boat aground at the rapids, provided pilots and equipments were sufficient there. The instruction relates to the grounding at the rapids, and not to any previous delay, which brought the grounding so late that the lead could not be got off and forwarded.

Appellants instruction No. 7, and the court's instructions Nos. 1 and 4, would prevent the jury being misled by No. 6, if indeed there were any thing in the latter calculated to mislead them. Chouteau and others vs. Uhrig et al. 10 Mo. Rep. 62.

3d. We come now to consider the instructions relating to the measure of damages. Those bearing upon this question are numbered 2, 3, 4, 5, 7 & 8. These also will be better understood by considering them in a different order from that of the record.

No. 7, asked by the appellants directs the jury upon the contingencies specified to allow the appellants such damages, as they believed the appellants suffered by reason of the delay in delivering the lead.

No. 4, given by the court upon its own motion, is to the same effect.

No. 5, also given by the court upon its own, and not excepted to, instructs the jury that in case they find the appellee chargeable with damages, the measure will be the difference in the value of the lead at the time it would probably have come to hand by careful and skilful management; and the value of it when it actually reached St. Louis.

The correctness of the foregoing three instructions, cannot now be questioned by the appellants.

No. 2, given at the request of the appellee, and accepted to by the appellants, instructs the jury, that if they believe from the evidence, that the price of lead in St. Louis, in the month of February 1846, after the lead in question arrived here, was as high as it had been during the last half of the November previous, the appellants will not be entitled to have any thing allowed them as damages for not delivering said lead in November.

In this connection it should be borne in mind, that had there been no detention, the lead would have reached St. Louis in the latter part, about the 20th of November 1845, and that in point of fact, it did not arrive then and was delivered on the 3d of February, 1846.

In respect to the instructions relative to the mode of ascertaining the value of the lead, we contend that the court committed no error.

No. 3, given at the request of the appellee, asserts that the best evidence of the price is actual sales, and directs the jury to be governed by such sales, instead of mere offers, made by one person to another.

The appellants resorted to actual sales to show the price in November, as they also did to show it in the spring. (See testimony of Webster and Morrison.) An offer may be evidence, that the market price is as *high*, though not the best evidence that it is as *low*, as the offer. Actual sales are certainly better evidence of the market price.

We contend therefore, that it is clear that under the evidence in the case, instruction No. 3, was properly given.

Instruction No. 8, was properly refused. It was particularly aimed at the sale spoken of by the witness, Morrison, made at the early part of February 1846, at $4 12½-100, of lead not then arrived, but which had been frozen up at the foot of the lower rapids, and was expected to arrive before the opening of navigation to Galena. The same witness states and every body knows that lead in St. Louis is higher before the opening of navigation to Galena, than after, when communication is opened with the whole lead region, and the accumulated supply of winter is thrown into market. The price diminishes as the opening of navigation approaches.

In February, then, lead not arrived, would not command a higher, if as high a price, as lead actually here. The probability of detention till the opening of navigation would tend to diminish the price. If the sale in question did not give the market price at the time, it certainly gave no *higher* price. The refusal of the instruction, therefore, could not harm the appellants.

The court does not say that that particular sale did give the market price, and to have said expressly that it did not, could not have conduced to the fair and proper decision of the case.

The instruction, as asked, could only have benefitted the appellants, by misleading the jury, and was, therefore, properly refused.

RYLAND, Judge, delivered the opinion of the court.

The questions arising on this statement of case, present the propri-

ety of the instructions given, as well as of those refused by the court below.

The appellants contend that the court erred in giving the instructions marked 6 and 1 as well as those marked 2 and 3 in the above statement. They contend, that by the instructions 6 and 1 as above set forth, the court assumed the law to be, that "an unnecessary or negligent delay, or the unseaworthyness of the vessel, will not make the carrier liable for a loss, unless the loser prove that such a loss was caused by such delay or unseaworthyness." Whereas, they insist the law under the most favorable view for the carrier, to be, that upon showing such delay or unseaworthyness and a loss, the carrier can exempt himself from liability therefor, only by showing that such loss would, and must have happened in the absence of such delay and unseaworthyness. Even this defence is a relaxation of the law, and not yet universally allowed. 11 Mo. Rep. 299; 6 Bingham 716 ; 12 Mo. Rep. 272 ; 10 Mo. Rep. 6 ; 4 Binney 127; Story on bailments, 413. I am not satisfied with these instructions numbered 6 and 1. They are not warranted by the authorities ; and the appellants view is the correct one ; and the authorities support them in that view.

This court has adopted the view above taken by appellants. If this was the only error committed by the court below, after having given the 7th instruction alone for defendants, I might be inclined not to interfere. That instruction is in these words : "If the jury believe from the evidence, that the boat after she was loaded, was delayed at Galena for a pilot, or that she started down without enough or proper pilots, or that she was materially deficient in the usual and needful equipments of boats in that trade, for getting through the difficulties of that navigation, and that these or any of these things contributed towards preventing the delivery of the lead that fall, they should allow the defendants such damages as from the evidence, they believe the defendants to have suffered by reason thereof." This instruction was calculated to bring all the testimony of the neglect or delay, or deficiency in equipments, and the consequences of such, if there were any, before the jury, and might have done away with the improper effect on the jury of the other instructions numbered 6 and 1, and I might be indisposed to disturb the verdict had these been the only instructions.

But the instruction marked number 2, is so clearly incorrect, that this case must be reversed and sent back, and therefore, I have noticed the illegallity of the 6th and 1st instructions, to prevent such on the future trial hereof.

By the 2nd. instruction, the jury are deprived of the power to give to the defendants, interest for the amount of the money, which would have arisen from the sale of the lead in November, provided the lead would have sold in February, as high as it could have been sold in November. That is, the court told the jury, "that if they found from the evidence, that the price of lead in St. Louis, in the month of February, 1846, after the lead in question had arrived there, was as high as it had been in the last half of the month of November, previous, the defendants will not be entitled to have anything allowed them in this case as damages, for not delivering said lead in November." No matter therefore, how careless or negligent, so ever, the carrier may have managed this business, if the lead was at length delivered, and at the time of delivery it was selling in market for as high a price as it had been selling at, during the period in which it by common care and diligence could have been delivered; yet for the use of this money for months, nothing is to be allowed. I am satisfied this must have escaped the attention of the court below. The damages sustained by the defendants therefore, in this case, although the lead was selling at the time it was delivered in February, as high as it had sold at in November, when it was in all probability to be delivered would be the interest for the time, upon the amount of such sales at least. The want of this money for two or three or more months, may have been a serious matter with the defendants as merchants; they should at least have lawful interest counted in as part of the damages. This point has been already decided by this court. I am not disposed to complain of the 3rd instruction, yet there may be cases when such sales would not be the best evidence of the value or price of commodity. In every case, the court should look at the nature of the evidence offered to prove price or value, and give to the jury such instructions as may best lead them to a proper conclusion. The actual sales in this case may have been the best criterion to ascertain value, and therefore, I will not condemn that instruction. The 8th instruction is in these words : "A sale of lead to arrive, does not give the market price, at the time of the sale."

This proposition I imagine would hardly be controverted. Such sales are, on one's own peculiar judgment. A speculator or close watching, sharp sighted observer of the past and the present might form an estimate for the future ; and prepare for consequences by buying on future delivery; such sales are not the best evidence of the market price of the commodity thus sold. This instruction therefore, should have been given.

I am, therefore, of the opinion that the court below erred in giving the

instructions numbered 6, 2 and 1, and in refusing to give the one numbered 8. The 5th instruction was not excepted to by defendants, but it is incorrect, notwithstanding, as it does not lay down a proper criterion, by which the jury are to estimate the damages. For these reasons therefore, it is my opinion that the judgment below ought to be reversed—that a new trial ought to be granted.

This cause is, therefore, remanded with directions to the court below to allow the defendant's motion for a new trial, and to proceed to hear and determine this cause in accordance with the views entertained by this court, and set forth in this opinion.